# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SIGNATURE BUILDING SYSTEMS OF PENNSYLVANIA, LLC AND SIGNATURE BUILDING SYSTEMS, INC. | |
| Plaintiffs, | 3:20-CV-2348 |
| v. | (JUDGE MARIANI) |
| MOTORIST MUTUAL INSURANCE CO. | |
| Defendant. | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On November 24, 2020, Plaintiffs Signature Building Systems of Pennsylvania, LLC and Signature Building Systems, Inc. ("Plaintiffs" or "Signature Building Systems") filed a complaint (the "Complaint") in the Court of Common Pleas of Lackawanna County. (Doc. 1-1). On December 15, 2020, Defendant Motorist Mutual Insurance Co. ("Defendant" or "Motorist Mutual") filed a Notice of Removal to remove the action from state court to this Court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441(b). (Doc. 1).

Presently before the Court is Defendant's Motion to Dismiss Plaintiffs' Complaint for failure to state a claim upon which relief may be granted (Doc. 4). For the reasons set forth below, the Court will deny Defendant's Motion to Dismiss.

## II. Procedural History and Factual Allegations

Defendant Motorist Mutual is an insurance company incorporated and with its principal place of business in the state of Ohio. (Doc. 1 at ¶ 9). Plaintiffs Signature Building Systems are construction companies with their main offices and principal places of business in Pennsylvania. (Doc. 1-1 at ¶ 9). From February 28, 2018 to February 28, 2019, Plaintiffs maintained an insurance policy with Motorist Mutual (the "Motorist Policy") through which Motorist Mutual insured certain commercial property controlled by Plaintiffs with general liability and commercial umbrella coverage. (*Id.* at 4). The Motorist Policy, entered between the parties, also included various subsections, including: (1) the "Commercial General Liability Coverage Form" (the "Property Coverage Form"), which sets forth the applications and limitations of the Motorist Policy, (Doc. 4-2 at 24-47); (2) the "Damage by Subcontractors Endorsement" (the "Subcontractor Endorsement"), which provides added coverage for damages to Plaintiffs' insured property caused by Plaintiffs' subcontractors, (*Id.* at 40); and (3) the "Products/Completed Operations Hazard Redefined" endorsement (the "Redefinition Endorsement"), which modifies the definition of the term "[p]roducts-completed operations hazard" under Section V of the Property Coverage Form, (*Id.* at 38, 41).[1]

---

[1] The parties argue over the general coverage of the Motorist Policy, but neither provide the full agreement, which likely will be necessary for the Court if it is to interpret the coverage provided within the agreement in the future. *See* (Doc. 5 at 5) ("Signature references and bases its claims on Motorists policy number 33.293912-90E ... but Signature does not attach the policy (which is 232 pages)" or the "key parts," including the Property Coverage Form, Subcontractor Endorsement, and the Redefinition Endorsement.).

2

On November 17, 2017, Plaintiffs entered into an agreement with a New Jersey apartment company through which Plaintiffs were to "design, construct[], deliver[] and erect[] a four-story prefabricated modular apartment building" (the "Carrino Project"). (Doc. 1-1 at ¶ 5). On June 25, 2018, Plaintiffs engaged a third-party contractor, Modsets, to have Modsets install and set modular units for the Carrino Project. (Id. at ¶ 6). In August 2018, however, after Modsets started work on the project, there appeared "various instances of water damage" to the property resulting from Modsets's work. (Id. at ¶ 7).

As a result, Plaintiffs filed a claim with Defendant under the Motorist Policy for the costs incurred to address this damage.[2] (Doc. 1-1 at ¶ 8). Defendant denied this claim by letter on October 1, 2018. (Id.). In response, Plaintiffs sent a follow-up letter, dated December 21, 2018, asserting coverage under the plan and demanding from Defendant reimbursement of losses exceeding $800,000.00. (Id. at ¶ 9); (Doc. 8 at 5). Plaintiffs maintain that this demand too was denied by letter, dated May 9, 2019. (Doc. 1-1 at ¶ 10). On May 10, 2019, Plaintiffs sent their final letter in which they claimed to have "expended approximately $2,000,000.00 in order to mitigate the damages in this matter," while the Defendant had allegedly failed to request any further information to evaluate the claim. (Id. at ¶ 11). Nevertheless, Plaintiffs' insurance claim remained unpaid. (Id.).

---

[2] Plaintiffs allege that they renewed their insurance plan with Defendant "insuring [their] commercial property, Inland Marine, general liability coverage and commercial umbrella coverage by policy number 33.293912-90E," but they do not clearly state in the Complaint that the property involved in the Carrino Project was covered by the Motorist Policy. (Doc. 1-1). Defendant has not pointed to this omission in its briefing, but the Court will note that this is a fact that remains at issue and subject to proof for Plaintiffs to sustain their causes of action.

On May 16, 2019, Plaintiffs filed a Writ of Summons in the Court of Common Pleas in Lackawanna County, Pennsylvania, (Doc. 1-1 at ¶ 12), and filed the Complaint on November 24, 2020 asserting claims against Defendant for breach of contract (Count I) and bad faith (Count II) as a result of Defendant's purported failure to properly assess and pay Plaintiffs' insurance claim. See (Id.). Plaintiffs demanded judgment against the Defendant and monetary recovery in an amount of $50,000.00 for Count I and in an amount in excess of $50,000.00 for Count II, together with interest, costs, fees and other damages. (Id. at 7, 19). Defendant removed the matter to this Court on December 15, 2020, (Doc. 1), and filed its Motion to Dismiss for failure to state a claim upon which relief may be granted two days later. (Doc. 4).[3]

### III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 505 U.S. 544, 570 (2007). The plaintiff must assert "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"While a complaint attached by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement

---

[3] Plaintiffs filed a Motion to Remand, (Doc. 7), in addition to their briefing in opposition to Defendant's Motion. (Docs. 9, 10). Plaintiffs' Motion to Remand, however, was denied by this Court on May 14, 2021 as the Complaint establishes diversity jurisdiction between the parties and the matter was timely removed by Defendant to this Court. 28 U.S.C § 1332; 12 U.S.C. § 1446(b)(1); see (Docs. 14, 15).

4

to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotation marks omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and question marks omitted).

A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but ... disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n. 14 (3d Cir. 2013) (internal citation and quotation marks omitted). Thus "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the United States*, 839 F.3d 336, 347 (3d Cir. 2016) (alterations in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013). "Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer probability that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at 678).

"The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting *Iqbal*, 556 U.S. at 679). The Court, however, does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face" and "nudge [a plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547; *see also Iqbal*, 556 U.S. at 680 (citing *Twombly*) (finding that respondent had failed to plead sufficient facts to state a claim for purposeful and unlawful discrimination as "respondent's complaint ha[d] not 'nudged [his] claims' of invidious discrimination 'across the line from conceivable to plausible'").

### IV. ANALYSIS

Plaintiffs' claims for breach of contract and bad faith stem from the contractual relationship between the parties set forth in the Motorist Policy, which incorporates the Property Coverage Form, the Subcontractor Endorsement, and the Redefinition Endorsement. Accordingly, these three portions of the complete and integrated Motorist

6

Policy held by Plaintiffs are asserted by Defendant as a bar to Plaintiffs' recovery. *See generally* (Doc. 5).[4]

The definitions of terms under the Motorist Policy were described in Section V of the Property Coverage Form entitled "Definitions." (Doc. 4-2 at 36). Of these definitions, the parties heavily rely on several in their filings, such as: "occurrence," which "means an accident, including continuous or repeated exposure to substantially the same general harmful conditions"; "property damage," which is defined as including "[p]hysical injury to tangible property, including all resulting loss of use of that property ... [or] [l]oss of use of tangible property that is not physically injured"; and "your work," which includes "[w]ork or operations performed by you [Plaintiffs] or on your behalf ...." (*Id.* at 38-39). In accordance with these defined terms, Defendant agreed to provide liability coverage to Plaintiffs for certain "occurrence[s]" under Section I of the Property Coverage Form entitled "Coverages – Coverage A Bodily Injury and Property Damage Liability," which states in part:

1. Insuring Agreement

    a. We [Defendant] will pay those sums that the insured [Plaintiffs] becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies....

---

[4] Generally, "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citing *Angelastro v. Prudential-Bache Sec. Inc.*, 764 F.2d 939, 944 (3d Cir. 1983)). Courts, however, may consider any "document integral to or explicitly relied upon in complaint ... without converting motion to dismiss into one for summary judgment." *Id.* (citation omitted); *In re Donald Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n. 9 (3d Cir. 1993) ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."). The Court may thus look to the Property Coverage Form, the Subcontractor Endorsement, and the Redefinition Endorsement as these portions of the Motorist Policy are integral to the Plaintiffs' claims.

      b. This insurance applies to "bodily injury" and "property damage" only if:
          (1) The "bodily injury" or "property damage" is caused by an "*occurrence*" that takes place in the "coverage territory";
          (2) The "bodily injury" or "property damage" occurs during the policy period; and
          (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you [Plaintiffs] to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred ….

(Doc. 4-2 at 24) (emphasis added). According to Defendant, this is interpreted to mean that "insurance only applies to a covered 'occurrence.'" (Doc. 5 at 6).

Plaintiffs allege that through the Subcontractor Endorsement, the definition of "occurrence" was expanded to include instances where damages were caused by Plaintiffs' subcontractors. (Doc. 10 at 3); (Doc. 5 at 7). The Subcontractor Endorsement states in part: (1) that it "modifies insurance provided under" the Property Coverage Form; and (2) that it adds to Section V – Definitions that:

> "[o]ccurence" includes acts or omissions that cause "property damage" within the "products-completed operations hazard" to or caused by "your work," but only if the damaged work or the work out of which the damage arises was performed on your behalf by your subcontractor(s).

(Doc. 4-2 at 40). Nevertheless, Defendant argue that under this expanded definition of what constitutes an "occurrence," coverage for damages caused by the work of a subcontractor working on Plaintiffs' behalf is restricted to acts or omissions within the definition of "products-completed operations hazard," thus adding greater emphasis to the definition of the term. (Doc. 5 at 7). Under the original Section V of the

8

Property Coverage Form, "products-complete operations hazard":

    a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
        (1) Products that are still in your physical possession; or
        (2) Prior Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
            (a) When all of the work called for in your contract has been completed.
            (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
            (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as complete.

(Doc. 4-2 at 38). As of August 23, 2018, however, the Redefinition Endorsement appears to have replaced "[p]aragraph a. of the definition of 'products-completed operations hazard' in the DEFINITIONS Section" of the Property Coverage Form. (Doc. 4-2 at 41). In its place, as of that date, "products-completed operations hazard" was to include "all 'bodily injury' and 'property damage' that arises out of 'your products' if the 'bodily injury' or 'property damage' occurs after you [Plaintiffs] *have relinquished possession of those products.*" (Doc. 4-2 at 41) (emphasis added).

9

Under the aforementioned definitions of terms and the allegedly restrictive natures of the Property Coverage Form and Subcontractor Endorsement, Defendant argues that Plaintiffs have failed to show that they were entitled to recovery under the Property Coverage Plan as the property that sustained water damage due to Plaintiffs' subcontractor's "acts or omissions" had not been "relinquished," but was still in Plaintiffs' possession.[5] (Doc. 5 at 12). In contrast, Plaintiffs argue that the Subcontractor Endorsement "expands rather than restricts coverage for property damage" and, regardless, there are "no facts or documents of record showing the status of completion [or possession] with respect to [S]ignatures['s] work" that would subvert Plaintiffs' insurance claim. (Doc. 10 at 11-12).

**1. Motion to Dismiss Plaintiffs' Breach of Contract Claim**

To sustain a claim for breach of contract, a plaintiff must generally establish: (1) "the existence of a contract, including its essential terms"; (2) "a breach of a duty imposed by the contract"; and (3) "resultant damages." *Fortunato v. CGA L. Firm*, 2018 WL 4635963, at *3 (M.D. Pa. Sept. 27, 2018) (citing *Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002)). In Pennsylvania, certain courts have also required that a plaintiff show it "complied with the

---

[5] In the alternative, Defendant contends that even if the new definition of "products-completed operations hazard" is not applied, Plaintiffs still fail to support their claims under the original definition of the term within Section V of the Property Coverage Plan as the circumstances surrounding the damages caused by Plaintiffs' subcontractor, Modsets, were still not "within the 'products-completed operations hazard.'" (Doc. 5 at 8-10).

contract's terms." *Levin v. Strayer Univ., LLC*, 2018 WL 3585124, at *3 (E.D. Pa. July 26, 2018) (citing *Nowosad v. Villanova Univ.*, 1999 WL 322486, at *6 (E.D. Pa. May 19, 1999)).

It is uncontested that the Motorist Policy, held by Plaintiffs with Defendant and incorporating the Property Coverage Form, Subcontractor Endorsement, and Redefinition Endorsement, is a contract and that the Plaintiffs made the requisite premium payments towards the policy to keep it active. *See* (Doc 1-1 at 4); (Doc. 5 at 5-13). Nor is it denied that the Defendant refused to pay Plaintiffs' insurance claim. (Doc. 1-1 at ¶¶ 8-11). Instead, the disagreement between the parties arises out of the meaning and effect of the Subcontractor Endorsement and Redefinition Endorsement on the coverage obligation of the Defendant under the Property Coverage Form.

From the original terms of the Property Coverage Form, the Motorist Policy applied to a covered "occurrence." (Doc. 5 at 6). Following the execution of the Subcontractor Endorsement, the definition of an "occurrence" was extended to include "acts or omissions that cause 'property damage' *within the 'products-completed operations hazard' to or caused by 'your work'*" where the acts or omissions were performed on Plaintiffs' behalf by their subcontractor. (Doc. 4-2 at 40) (emphasis added); (Doc. 5 at 7). For Defendant, the term "products-completed operations hazard," whether following the original definition in Section V of the Property Coverage Form or the adjusted definition in the Redefinition Endorsement, bars recovery as it contends that the Plaintiffs' work was not yet complete and the insured property was still in Plaintiffs' possession. (Doc. 5 at 13-14). In contrast,

Plaintiffs, regardless of the competing definitions, point to the apparent exception allowing for work to be considered "completed," and recovery granted here, where the only remaining work to be done at the time the damages were incurred was "service, maintenance, correction repair or replacement." (Doc. 10 at 13); (Doc. 4-2 at 38). Thus, the question as to whether Plaintiffs are entitled to recovery under the Motorist Policy will require interpretation and application of these terms to the facts established by the parties through discovery and, if necessary, at trial.

Disputes over the meaning of the Subcontractor Endorsement and the terms within Section V of the Property Coverage Form and the Redefinition Endorsement are not issues that can be adjudicated at the motion-to-dismiss stage of litigation. Instead, the Court must determine whether Plaintiffs have asserted "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. On the facts alleged, the Court finds that a plausible claim for breach of contract has been stated under the Subcontractor Endorsement, which provides that a covered "'occurrence' includes acts or omissions that cause 'property damage' within the 'products-completed operations hazard' to *or* caused by 'your work'" where the damages arose from work "performed on [Plaintiffs'] behalf by [their] subcontractor(s)." (Doc. 4-2 at 40) (emphasis added).

Defendant, in turn, has not clearly shown how Plaintiffs failed to state a factual claim for breach of contract but instead focuses on how its interpretation would bar the Plaintiffs'

claim. *See Rosenberg v. Amica Mut. Ins. Co.*, 2018 WL 4944396 (W.D. Pa. July 12, 2018) (denying motion to dismiss where, accepting alleged facts as true, the plaintiff properly established the existence of an insurance policy, failure of the defendant to pay policy benefits, and resulting damages). As it is improper for the Court to resolve disputed issues of fact on a motion to dismiss, the Defendant's Motion to Dismiss Plaintiffs' breach of contract claim will be denied.

### 2. Motion to Dismiss Plaintiffs' Bad Faith Claim

In order to recover on an insurance-based bad faith claim, the insured must prove: (1) that the insurer did not have a reasonable basis for denying benefits under the policy; and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis in denying the claim. *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) (citing *Keefe v. Prudential Prop. and Cas. Ins. Co.*, 203 F.3d 218, 225 (3d Cir. 2000)); *see also* 42 Pa. Stat. and Cons. Stat. Ann. § 8371. Pennsylvania courts have interpreted the term "bad faith" to mean:

> any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Perkins v. State Farm Ins. Co.*, 589 F. Supp. 2d 559, 562 (M.D. Pa. 2008) (citing *Terletsky v. Prudential Prop. and Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994) (quoting BLACK'S LAW DICTIONARY 139 (6th ed. 1990)) (citations omitted); *see also Nw. Mut. Life*

*Ins. Co.*, 430 F.3d at 137 (predicting that the Pennsylvania Supreme Court would define "bad faith" according to the definition set forth in *Terletsky*).

Plaintiffs allege that the Defendant twice improperly denied their claim, on October 1, 2018 and May 9, 2019 respectively, and failed to conduct a proper analysis to support its denial.[6] (Doc. 1-1 at ¶¶ 8, 10). Plaintiffs further assert that Defendant's inadequate process in reviewing their claim, including over fifty alleged points of bad-faith conduct, evinced a clear effort to "unreasonably and unfairly den[y] and/or delay[] payment of benefits" to Plaintiffs that the Defendant "knew, or should have known, … should have been paid." (*Id.* at ¶¶ 35, 48); see also (*id.* at ¶ 49) (Plaintiffs' generic list of alleged conduct provided to support their claim). Defendant, in response, argues that as a bad faith claim requires a predicate breach of contract, Plaintiffs' claim should be dismissed as, in Defendant's view, the Plaintiffs' breach of contract claim is unsupported. (Doc. 5 at 15-16); *see Moses Taylor Foundation v. Coverys*, 2021 WL 1017371, at *4 (M.D. Pa. Mar. 17, 2021) (bad faith claim properly dismissed where plaintiff fails to adequately plead a breach of contract claim). As it has been established above, however, that Plaintiffs adequately pleaded a claim for breach

---

[6] Plaintiffs alleged in the Complaint that Defendant, in its May 9, 2019 letter, had "maintain[ed] its denial of coverage" with a "specific refence to the '*Damage by Subcontractor's Endorsement*.'" (Doc. 1-1 at ¶ 10). This claim, however, appears to be undermined by Plaintiffs' own assertion in its answer to Defendant's Motion to Dismiss arguing that the May [9], 2019 letter "makes no reference, citation or even inference to the '*Damage by Subcontractor's Endorsement*.'" (Doc. 9 at ¶ 10). Plaintiffs further undermine their allegation that there was bad faith when it agreed that Defendant sought to "clarify some facts, timelines and damages" concerning Plaintiffs' claim in that same letter. (*Id.*); (Doc. 9-2). Nevertheless, such factual disputes are not ripe for adjudication at this point of the litigation.

of contract, and Plaintiffs subsequently alleged facts sufficient to state a bad faith claim, Defendant's Motion to Dismiss Plaintiffs' bad faith claim with be denied.

## V. CONCLUSION

For the aforementioned reasons, Defendant's Motion to Dismiss Plaintiffs' Complaint for failure to state a claim upon which relief may be granted (Doc. 4) will be denied. A separate Order will follow.

*signature*

Robert D. Mariani
United States District Judge