## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SIGNATURE BUILDING SYSTEMS** | : | **No. 3:20cv2348** |
| **OF PENNSYLVANIA, LLC, and** | : | |
| **SIGNATURE BUILDING SYSTEMS,** | : | **(Judge Munley)** |
| **INC.,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MOTORISTS MUTUAL INSURANCE** | : | |
| **COMPANY,** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court is a motion for summary judgment filed by Defendant Motorists Mutual Insurance Company ("Motorists") in this dispute over insurance coverage in the commercial construction setting.  Plaintiffs Signature Building Systems of Pennsylvania, LLC and Signature Building Systems, Inc. (collectively "Signature") assert state law breach of contract and insurance bad faith claims against Motorists. (Doc. 1-1, Compl.)  Motorists advances a counterclaim seeking declaratory judgment. (Doc. 19).  The motion for summary judgment, however, does not address the defendant's counterclaim.  (Doc. 43. Defs. Mot. ¶ 95; Doc. 43-1, Prop. Order).   Having been fully briefed, the defendant's motion is ripe for disposition.

**Background**

Signature manufactures and sells prefabricated modular units, which are used for the construction of buildings, including residences.[1] (Doc. 46, SOF ¶ 3). Relevant to this case, in November 2017, Signature executed a contract with Carrino Plaza Apartments, LLC ("Carrino Plaza") to manufacture and install modular units for an apartment building project in Newark, New Jersey. (Id. ¶ 5).

Under the contract with Carrino Plaza, Signature's work included: "design, construction, delivery, and erection of a four-story prefabricated modular apartment building consisting of 122 apartments." (Id. ¶ 6).  The scope of work included: 1) manufacturing the units; 2) delivering the units to the jobsite in Newark; and 3) setting the units. (Id. ¶ 7).  For the roof units, Signature's contractual work included: 1) "wrapp[ing] the top ceiling frame prior to roof structure with water resistant wrap for temporary site protection"; 2) "complet[ing] the roof frame over modular portion"; and 3) "set mate line structural connections." (Id.)

In June 2018, Signature executed a subcontract with a company called ModSets to set, install, and connect the modular units in the construction of the

---

[1] When possible, the court cites to the defendant's statement of material facts ("SOF"), (Doc. 46), for facts which the plaintiffs admitted in their response, (see Doc. 48).  Otherwise, the court cites to portions of the evidentiary record supplied by the parties.  All facts from the record are construed in a light most favorable to the plaintiffs. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015)(citation omitted).

apartment building, including the roof units. (Id.)  Per the subcontract, ModSets was obligated to "install temporary weather protection materials on [the] building(s)" as provided. (Id.)  ModSets was obligated to "maintain temporary weather protection until [their] scope of work for each building…[was] completed." (Id.)  According to the subcontract, ModSets was "only responsible for temporary protection of EPDM roof-seams…with Zip Tape [.]"[2] (Id. ¶ 11).

At some point during construction of the Carrino Plaza project, ModSets walked off the job without finishing. (Id. ¶ 28).   Signature's corporate designee, Jay Bradley, testified that ModSets "didn't finish putting some of the roof panels in place at the corridors, and they didn't finish some of the seaming.  They had set the last modular box, and they basically broke down and left." (Doc. 43-5, Def. Ex. F. 82:4-83:6).

Signature alleges that, due to ModSets' failure to install temporary weather protection and failure to complete its work, rain infiltrated the modular units on August 23, 2018. (SOF ¶ 13).  Signature thus hired a replacement contractor to complete the work.  (Id. ¶ 35).  Signature also asserts that it has spent over $2,000,000 remediating the damage caused by water infiltration.  (Id. ¶ 16).

---

[2] EPDM is a synthetic rubber roofing membrane; it was used here on the upper modular units to protect against weather until a final roof was completed by a roofing contractor. (Doc. 46, SOF ¶ 13, n. 5).  "Zip Tape" refers to an adhesive tape used to form a weather-resistant barrier.

Signature turned to its insurer, Motorists, to cover the damages.  Motorists had issued Signature a policy of insurance, No. 33-293912-90E, effective from February 28, 2018 to February 28, 2019 ("the Motorists policy").  (Id. ¶ 4). Motorists appears to have first denied commercial property coverage. (See Doc. 48-3, Pl. Ex. 6, B. Cooney Ltr. 10/01/2018).

Subsequently, during prelitigation communications, Signature asserted that commercial general liability provisions covered the loss.  (Doc. 48-4, Pl. Ex. 10, M. Mey. Ltr. 12/21/2018).  As discussed below, the Motorists policy relative to commercial general liability coverage includes various forms and endorsements, including: (1) a Commercial General Liability Coverage Form; (2) a Damage by Subcontractors Endorsement; and (3) a Products/Completed Operations Hazard Redefined Endorsement.  (Id. ¶¶ 18, 21, 25).  Signature contends that the commercial general liability portion of the Motorists policy applies to the loss and that the Damage by Subcontractors Endorsement applies. (Id. ¶ 60).  Motorists asserts that these policy provisions do not provide coverage.  Rather, Motorists contends that Signature is attempting to convert third-party general liability coverage into first-party property coverage.

As indicated above, Signature's complaint maintains a common law breach of contract claim (Count I) and a claim for insurance bad faith pursuant to 42 PA. CONS. STAT. § 8371 (Count II).  After review of the defendant's motion for

4

summary judgment, Signature's breach of contract claim turns on questions relative to the definitions of "occurrence" and "products-completed operations hazard" under the forms and endorsements applicable to commercial general liability coverage.  As for the Signature's claim against Motorists for bad faith, Motorists contends that there can be no bad faith where there is no coverage.

On June 12, 2019, Signature initiated this action in the Lackawanna County Court of Common Pleas by filing a writ of summons. (Doc. 1, Notice of Removal, ¶ 3).  Signature filed a state court complaint on November 24, 2020. (Id.) Motorists removed this action on December 15, 2020, (Doc. 1), and the Honorable Robert D. Mariani denied Signature's motion to remand, (Doc. 14). Upon transfer of this matter, the undersigned granted a joint motion to extend case management deadlines. (Doc. 42).  At the close of discovery, Motorists filed the instant motion for summary judgment, which brings the case to its present posture.

**Jurisdiction**

The court has jurisdiction pursuant to the diversity statute, 28 U.S.C. § 1332.  Signature alleges that its two entities are Pennsylvania business corporations with their principal place of business in Moosic, Pennsylvania (Doc. 1-1, Compl., ¶ 1).  Defendant is incorporated under the laws of the State of Ohio with its principal place of business in Ohio. (Doc. 1, Notice of Removal, ¶ 9).

5

Additionally, the amount in controversy exceeded $75,000 at the time this matter

was commenced.  Because complete diversity of citizenship exists among the

parties and the amount in controversy exceeded $75,000 at the commencement

of the action, the court has jurisdiction over this case.  See 28 U.S.C. § 1332

("district courts shall have original jurisdiction of all civil actions where the matter

in controversy exceeds the sum or value of $75,000, exclusive of interest and

costs, and is between . . . citizens of different states[.]"); 28 U.S.C. § 1441 (A

defendant can generally move a state court civil action to federal court if the

federal court would have had original jurisdiction to address the matter pursuant

to the diversity jurisdiction statute).  As a federal court sitting in diversity, the

substantive law of Pennsylvania shall apply to the instant case.  Chamberlain v.

Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304

U.S. 64, 78 (1938)).

**Standard of Review**

Motorists has filed a motion for summary judgment.  Granting summary

judgment is proper " 'if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4

(3d Cir.1997) (quoting FED. R. CIV. P. 56(c)).  "[T]his standard provides that the

6

mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact." Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the

facts in the light most favorable to the party opposing the motion. Int'l Raw

Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990).  The

burden is on the moving party to demonstrate that the evidence is such that a

reasonable jury could not return a verdict for the non-moving party. Anderson,

477 U.S. at 248.  A fact is material when it might affect the outcome of the suit

under the governing law. Id.  Where the non-moving party will bear the burden of

proof at trial, the party moving for summary judgment may meet its burden by

showing that the evidentiary materials of record, if reduced to admissible

evidence, would be insufficient to carry the non-movant's burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party

satisfies its burden, the burden shifts to the nonmoving party, who must go

beyond its pleadings, and designate specific facts by the use of affidavits,

depositions, admissions, or answers to interrogatories showing that there is a

genuine issue for trial. Id. at 324.

7

## Analysis

### 1. Policy Terms

Count I of the complaint asserts a breach of contract claim against

Motorists. [3]  To assess Signature's breach of contract claim, the court must first

narrow some issues relative to the applicable policy terms outlining the scope of

coverage.  Under Pennsylvania law, insurance policies are interpreted using

contract principles, "as, at base, an insurance policy is nothing more than a

contract between an insurer and an insured." Gallagher v. GEICO Indem. Co.,

201 A.3d 131, 137 (Pa. 2019)(citation omitted).  If policy terms are clear and

unambiguous, then those terms are given their plain and ordinary meaning,

unless those terms violate a clearly established public policy.  Kurach v. Truck

Ins. Exch., 235 A.3d 1106, 1116 (Pa. 2020)(citation omitted).  Where terms are

ambiguous, or "subject to more than one reasonable interpretation when applied

to a particular set of facts[,]" the policy provision is to be construed "in favor of the

policyholder and against the insurer, as the insurer drafted the policy and

selected the language which was used therein." Id. (citations omitted and

---

[3] To recover on a breach of contract claim under Pennsylvania law, a plaintiff must show: (1)
the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3)
resultant damages. Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone
Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016)(citation omitted).

quotation marks removed). Bearing these standards in mind, the court will discuss the policy language at issue here.

Construing the allegations of the complaint to match the terms of the Motorists policy, Signature alleges that an "occurrence" was caused by its subcontractor, ModSets, and that such an "occurrence" led to "property damage." (See Doc. 46, SOF ¶ 20). The Commercial General Liability Form provides coverage for property damage as follows:

> **SECTION I - COVERAGES**
> **COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
>
> 1.    **Insuring Agreement**
>     a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.
>
>       …
>
>     b. This insurance applies to "bodily injury" and "property damage" only if:
>
>         (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory" ....

(Doc. 43-4, Def. Ex. C., ECF p. 56).

Thus, there is no dispute that insurance coverage only applies to a covered "occurrence." (Doc. 46, SOF ¶ 18). Moreover, the Section I – Coverage section includes various enumerated exclusions. Having parsed Motorists' motion for summary judgment, its statement of material facts, and briefing, however, Motorists does not contend that the loss at issue falls within an exclusion.

9

Rather, this dispute comes down to whether certain definitions apply to Signature's claim for damages caused by ModSets.

Under the Commercial General Liability Form, "occurrence" is defined in Paragraph 13 of Section V – Definitions to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[4] (Doc. 43-4, Def. Ex. C., ECF p. 70). This definition is not addressed by the parties as being applicable.

Instead, the parties focus on the terms from the Damage by Subcontractors Endorsement, which modifies the Commercial General Liability Form. (Doc. 46, SOF ¶ 21). The Damage by Subcontractors Endorsement states:

**Damage By Subcontractors Endorsement**          **CG 7053 (09-09)**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGEFORM** [sic]

This endorsement modification is subject to all other terms, conditions, provisions and exclusions of the policy.

The following is ***added*** to **SECTION V – Definitions:**

---

[4] To reach disposition of Motorists' motion for summary judgment, there is no need to analyze the definition of the term "property damage." For completeness, "property damage" is defined in Paragraph 17 of Section V – Definitions in the Commercial General Liability Form to mean: "**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." (Doc. 43-4, Def. Ex. C., ECF pp. 70-71).

> "Occurrence" includes acts or omissions that cause "property damage" within the "products-completed operations hazard" to or caused by "your work," but only if the damaged work or the work out of which the damage arises was performed on your behalf by your subcontractor(s).

(Doc. 43-6, Def. Ex. J, ECF p. 63)(emphasis applied to the word "added").

There is no dispute that the Damage by Subcontractor Endorsement *adds* to the definition of "occurrence." (Doc, 46, SOF ¶ 22). The second accepted definition of "occurrence" under the Damage by Subcontractors Endorsement creates a new consideration: the definition of "products-completed operations hazard."

"Products-completed operations hazard" is defined by the Commercial General Liability Form. (Doc. 43-4, Def. Ex. C., ECF p. 70). But like the definition of "occurrence," the definition of "products-completed operations hazard" is altered by an endorsement. Specifically, the Motorists policy contains a Products/Completed Operations Hazard Redefined Endorsement. (Doc. 43-6, Def. Ex. K, ECF p. 65). That endorsement states:

**Products/Completed Operations**                    **CG 2407 (01-96)**
**Hazard Redefined**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement ***modifies*** insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

With respect to "bodily injury" or "property damage" arising out of "your products" manufactured, sold, handled or distributed:

**1.** On, from or in connection with the use of any premises described in the Schedule, or

11

2.  In connection with the conduct of any operation described in the Schedule, when conducted by you or on your behalf,

Paragraph a. of the definition of "Products-completed operations hazard" in the DEFINITIONS Section is **_replaced_** by the following:

"Products-completed operations hazard":

a.  Includes all "bodily injury" and "property damage" that arises out of "your products" if the "bodily injury" or "property damage" occurs after you have relinquished possession of those products.

…

| SCHEDULE | |
|---|---|
| PREMISES NUMBER | DESCRIPTION OF OPERATION |
| 0001 | MODULAR UNITS MFG. |

(Id.)(emphasis applied to the words "modifies" and "replaced").[5]

The Products/Completed Operations Hazard Redefined Endorsement

contains an "as of" date of August 23, 2018, or the date that Signature alleges

that its Carrino Plaza modular units were damaged by water infiltration. (Doc. 43-

6, Def. Ex. K, ECF p. 65).  Motorists takes the position that this is a coincidence.

(See Doc. 46, SOF ¶ 25).  But coincidences do not result in Motorists' position

regarding the policy language.  Rather, the defendant spends considerable time

arguing that the "products-completed operations hazard" definition from the

Commercial General Liability Coverage Form applies to this dispute without

---

[5] For completeness, Premises 0001 is listed in a separate schedule as Signature's principal place of business in Moosic, Pennsylvania.  (See Doc. 3-3, Def. Ex. E to Def. MTD at ECF p. 46).

asserting facts that would cause it to apply. (Doc. 43, Def. MSJ ¶¶ 30, 48-53, Doc. 53, Def. Reply Br. 1-2).

Per the Products/Completed Operations Hazard Redefined Endorsement, the definition of "products-completed operations hazard" in the Commercial General Liability Coverage Form had been replaced "as of" August 23, 2018, or the alleged date of loss. Absent evidence that the Products/Completed Operations Hazard Redefined Endorsement was not in effect, or that the loss actually occurred on an earlier date, the definition of "products-completed operations hazard" from the Products/Completed Operations Hazard Redefined Endorsement controls in this dispute. Neither Motorists nor Signature has provided evidence demonstrating that the replacement language from the endorsement is inapplicable.

Consequently, the court looks at the plain and ordinary meaning of the Products/Completed Operations Hazard Redefined Endorsement. For the purposes of this dispute, this is not a difficult task. "Replaced" means replaced. That is, the agreed-upon language in the Commercial General Liability Coverage Form was substituted for other agreed-upon language in the endorsement. Consequently, the court will only consider the definition of "products-completed operations hazard" from the Products/Completed Operations Hazard Redefined Endorsement and not the definition from the Commercial General Liability

13

Coverage Form.   Half of the arguments raised by Motorists in its motion for summary judgment are thus ill-suited to resolve the matter at this juncture.

To summarize the above, the definition of "occurrence" comes from both the Commercial General Liability Coverage Form **and** the Damage by Subcontractor Endorsement.  The definition of "products-completed operations hazard" comes from **only** the Products/Completed Operations Hazard Redefined Endorsement.

The definitions of "occurrence" and "products-completed operations hazard" also refer to "your product" and "your work," which are separately defined by the Commercial General Liability Coverage Form.  Under the policy:

**21. "Your product"**:

    **a. Means:**

        **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

            **(a)** You;

            **(b)** Others trading under your name; or

            **(c)** A person or organization whose business or assets you have acquired; and

        **(2)** Containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products.

        …

14

22. **"Your work":**

    a. **Means:**

        **(1)** Work or operations performed by you or on your behalf; and

        **(2)** Materials, parts or equipment furnished in connection with such work or operations.

(Doc. 43-4, Def. Ex. C., Commercial General Liability Coverage Form, ECF p. 71).

## 2.    Application to the Breach of Contract Claim

The above determinations impact the arguments asserted by Motorists in its motion for summary judgment. Limiting Motorists' arguments to the applicable definition of "products-completed operations hazard," this case turns on whether property damage occurred after Signature relinquished possession of those products.

Motorists contends that "Signature had not 'relinquished possession' of its products to Carrino Plaza at all." (Doc. 43, Def MSJ at ¶ 58). Thus, per Motorists, possession must have been relinquished to the other party in the Signature-Carrino Plaza contract to fit within the "products-completed operations hazard" definition.

In its response to Motorists' statement of material facts, Signature counters that its claim falls squarely within definition because it relinquished possession of its products to ModSets. (Doc. 48 ¶¶ 48-52). Signature also contends that

Motorists' arguments are "attempts to twist and interweave terms and conditions within its policy of insurance which either do not exist or do not apply." (Id. ¶ 50).

After careful review, there is no dispute of material fact regarding whether Signature relinquished possession to ModSets.  Specifically, in one portion of its summary judgment motion, Motorists argues:

> • 16(a)(1) Were Signature's products still in Signature's physical possession?
>
> **Answer:** No, they were in the possession of ModSets, as the ModSets crew was installing the modular units, and as Signature only had one person at the jobsite at any given time after the modular units were delivered, and that person had a limited role.

(Doc. 43, Def. MSJ ¶ 49). Motorists follows up that statement with the following argument: "Accordingly, discovery is over and the evidence is that Signature did not have possession of the structure when the rain occurred on August 23, 2018. ModSets did." (Id.)

Returning to the applicable definition of "products-completed operations hazard," the policy terms are silent as to whom possession of those products must be relinquished.  Hence, this case features two reasonable interpretations of the policy terms when applied to a particular set of facts. See Kurach, 235 A.3d at 1116 (citing Madison Const. Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 606, 735 A.2d 100, 106 (1999)).  That ambiguity must be resolved in favor of Signature in this dispute.  See id. (citations omitted).  Thus, Signature's

relinquishment of the modular units to ModSets to complete the terms of the

subcontract fits within the definition of "products-completed operations hazard" as

drafted by Motorists.[6]

Turning next to the definition of "occurrence" from the Commercial General

Liability Coverage Form, that term "includes acts or omissions that cause

'property damage' within the 'products-completed operations hazard' to or

caused by 'your work,' but only if the damaged work or the work out of which the

damage arises was performed on your behalf by your subcontractor(s)." (Doc.

43-6, Def. Ex. J, ECF p. 63).  The facts relied upon by Motorists in seeking

summary judgment demonstrate that acts or omissions of ModSets caused

property damage and that the damaged work was performed on Signature's

behalf by ModSets pursuant to a subcontract.  Having concluded that

relinquishment of possession of the modular units to ModSets falls within the

"products-completed operations hazard" definition, Motorists' motion for summary

judgment as it relates to the breach of contract claim must be denied.

---

[6] Even if the ambiguities were resolved in favor of Motorists, there are genuine issues of
material fact as to whether Signature had relinquished possession of its products (the modular
units) to Carrino Plaza under the Signature-Carrino Plaza contract.  For example, Signature's
representative testified that ModSets abandoned the job after the modular units were set upon
Carrino Plaza's foundation. (Doc. 43-5, Def. Ex. F, J. Bradley Dep. 106:12–110:6).  Per
Signature's representative, Carrino Plaza controlled the building at that point. (Id., 146:10-
148:16).

### 3.     Bad Faith

Count II of Signature's complaint asserts a cause of action for bad faith under 42 PA. CONS. STAT. § 8371.  Motorists' argument in support of summary judgment on Signature's bad faith claim is intertwined with its position on insurance coverage.   Motorists contends that no coverage means no bad faith. Nonetheless, Motorists has not met its burden at the summary judgment stage regarding the insurance contract and Signature's breach of contract claim will proceed.  Thus, the defendant's arguments regarding Signature's bad faith claim only need to be addressed summarily.

Section 8371 itself does not define bad faith. Rancosky v. Washington Nat'l Ins. Co., 170 A.3d 364, 372 (Pa. 2017).  Courts have generally defined the term as " 'any frivolous or unfounded refusal to pay proceeds of a policy.' " Id., 170 A.3d at 373 (quoting Terletsky v. Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa. Super. Ct. 1994)).

In order to recover under Section 8371, "the plaintiff must present clear and convincing evidence (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew of or recklessly disregarded its lack of a reasonable basis." Rancosky, 170 A.3d at 365 (adopting the test set forth in Terletsky, 649 A.2d at 688).

18

Under the first prong adopted in Rancosky, the question of "whether the insurer had a reasonable basis for denying benefits is an objective inquiry into whether a reasonable insurer would have denied payment of the claim under the facts and circumstances presented." 170 A.3d at 374. Under the second prong, "proof of the insurer's knowledge or reckless disregard for its lack of reasonable basis in denying the claim is sufficient for demonstrating bad faith[,]" and evidence of "the insurer's subjective motive of self-interest or ill-will, while perhaps probative of the second prong of the above test, is not a necessary prerequisite to succeeding in a bad faith claim." Id. at 377. Additionally, "[c]laims of bad faith are fact specific and depend on the conduct of the insurer toward its insured." Wenk v. State Farm Fire & Cas. Co., 228 A.3d 540, 547 (Pa. Super. Ct. 2020), app. denied, 242 A.3d 309 (Pa. 2020) (citation omitted).

In opposition to Motorists' sparse arguments seeking summary judgment on the bad faith claim, Signature has provided claims notes, correspondence, and the deposition testimony of Motorists' corporate representative to demonstrate genuine issues of material fact. As to that claim, Motorists' motion will also be denied.

**Conclusion**

For the reasons set forth above, Motorists' motion for summary judgment will be denied. An appropriate order follows.

19

Date: 3/3/25

JUDGE JULIA K. MUNLEY
United States District Court